UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| PAMELA DENING, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 21-221-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| AETNA LIFE INSURANCE | ) | **MEMORANDUM OPINION** |
| COMPANY, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of the parties' cross motions for judgment. [Record No. 21; Record No. 22]  Plaintiff Pamela Dening argues that she meets her insurance plan's definition of disability and seeks reversal of Defendant Aetna Life Insurance Company's administrative decision terminating her long-term disability benefits.  [Record No. 21-1]  Aetna, on the other hand, argues that Dening does not meet the terms of the plan and urges the Court to affirm its decision.  [Record No. 22-1]

Following review the administrative record and the parties' arguments, the Court finds that Aetna's decision was correct.  For the additional reasons outlined below, Aetna's motion will be granted, Dening's motion will be denied, and her claim will be dismissed.

**I.**

Dening began working for Amazon Corporate LLC ("Amazon") on March 22, 2015. [00022][1]  She was employed as an FC Associate I, a medium duty occupation that requires lifting up to 49 pounds, standing and walking for 10-12 hours, frequent pushing, pulling, squatting, bending, and reaching, and continuous climbing and descending of stairs.  [02976, 03548]  As a benefit of her employment, Dening obtained long term disability ("LTD") coverage under Amazon's employee welfare benefit plan (the "Plan"), which is insured by Aetna Life Insurance Company ("Aetna") and governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA").

The LTD portion of the Plan employs two different tests of disability, one applicable during the first 24 months that benefits are payable, and one applicable following that 24-month period.  For the first 24 months, the Plan requires that a claimant "cannot perform the material duties of [her] own occupation" due to injury or illness.  [04121]  After 24 months, it requires that a claimant be "unable to perform [the] material duties of any occupation solely because of an illness, injury, or disabling pregnancy-related condition."[2]  [*Id.*]  The Plan defines "any occupation" as "any gainful activity . . . [f]or which [the claimant is], or may reasonably become, fitted for by training, education, experience; and [w]hich results in, or can

---

[1]     For the sake of consistency and simplicity, citations to the administrative record will take the form of "0__", referring to the Bates numbering present in the bottom right corner of each page (beginning with "ALIC").  The record has been filed under seal and is located at Record Numbers 14-1 through 14-14.

[2]     The Plan also specifies that "[y]ou will no longer be considered as disabled and eligible for long term monthly benefits after monthly benefits have been payable for 24 months if it is determined that your disability is primarily caused by . . . [a] *mental health or psychiatric condition, including physical manifestations of these conditions*."  [04167 (emphasis added)]

be expected to result in, an income of more than 80% of [the claimant's] adjusted predisability earnings." [04115]  Payment of benefits ends on the occurrence of any one of multiple events, including "the date [the claimant] no longer meet[s] the LTD test of disability, as determined by Aetna," the "date [the claimant] fail[s] to provide proof that [she] meet[s] the LTD test of disability," and "the day after Aetna determines that [the claimant] can participate in an approved rehabilitation program and [she] refuse[s] to do so." [04122]

Dening stopped working at Amazon on approximately November 23, 2016, due to uncontrolled asthma and shortness of breath.  [02975–76, 03127, 03170, 03450]  According to Dening, she was subsequently diagnosed with "sarcoidosis through biopsy, in addition to severe persistent asthma, chronic fatigue, chest pain, dyspnea on exertion, mediastinal adenopathy, and obstructive sleep apnea."[3]  [Record No. 21-1, p. 2 (internal footnote omitted) (citing 00791)]  Based on these symptoms, Aetna determined that Dening had "impairment to sustained exertional activity such as repetitive lifting of moderate to heavy weight and sustained walking," that would preclude her from performing the physical requirements of her warehouse job.  [00013, 00124]  On September 1, 2017, Aetna approved her claim under the own occupation test of disability and began paying benefits effective May 22, 2017 (following the Plan's 180-day elimination period).  [03552–53, 04196]

Aetna engaged in ongoing monitoring of Dening's claim for the next few months.  It informed her several times that the test of disability would change to the any occupation

---

[3]      Sarcoidosis is "a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of your body — most commonly the lungs and lymph nodes."  *Sarcoidosis*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/sarcoidosis/symptoms-causes/syc-20350358 (last visited July 7, 2022).

standard in May 2019.  [03553, 03585]  Dening advised that it was "mainly breathing and asthma [that] keeps her from working," during a phone call in July 2018, but that her depression and anxiety impede her as well.  [0009, 00198]

Dening's pulmonologist, Dr. Firas Koura, submitted to Aetna Attending Provider Statements in both April and August of 2018.  [03208, 02639–41]  In the April form, Dr. Koura noted that, while Dening cannot perform "excessive physical activity," she could still lift/push "up to 10 lbs."  [03208]  With the August 2018 form, Dr. Koura also provided a Capabilities and Limitations Worksheet specifying that she was able to sit, stand, and walk up to 75% of the time, use her hands for repetitive motions and grasping up to 75% of the time, and lift up to 5 pounds 75% of the time.  [02639–41]  The Worksheet also specified that she should not be exposed to dust or fumes.  [02641]

Aetna consulted with nurse Holly Shepler for a clinical review of Dening's medical records on September 18, 2018.  [00234–38]  Shepler concluded that the evidence supported impairment to sustained or reliable activity.  [00237]  Based on this conclusion, Aetna determined that Dening satisfied the any occupation test of disability and approved her claim for ongoing benefits on September 24, 2018.  [0006–07, 03599–600]  However, Aetna continued to monitor Dening's claim, and requested updated records and information in the fall of 2019.  [00005, 00264–73, 03600–01, 03607–08, 03614–42]

In October 2019, Dening's family medicine APRN Jennifer Morris submitted an Attending Physician Statement noting that Dening could sit, stand, and walk for one hour at a time.  [02999–3000]  A few months later, in March 2020, Dening's primary care physician Dr. Charles Arnold submitted a virtually identical assessment in his own Attending Physician

Statement.  [02853]  He did, however, specify that engaging in "too much" bending at the waist, kneeling, crouching, climbing, or balancing would result in shortness of breath.  [*Id.*] Dening also admitted during this time period that she might be able to work a "sit down job" as long as she had access to her inhalers.  [00283]

Aetna obtained her mental health records and consulted with psychologist Maria Villalba in an effort to evaluate Dening's complaints of disabling mental health issues.  [00004, 00292]  Villalba concluded that the "information does not support [out of work] status due to psychological impairment" after analyzing the evidence.  [00298] While Dening was having difficulty coping with current stressors, there was no evidence of "severe emotional, cognitive, or behavioral impairment that would prevent [her] from working in any reasonable occupation."  [*Id.*]  Seeking further information, Villalba sent requests to Dening's therapist, LCSW Barbara Waldner, and her psychiatric provider at Oliver Wilson Behavioral Urgent Care.  [00304, 03627–33]

Ms. Waldner responded on February 3, 2020, with an Attending Physician Statement, notes, and a handwritten letter.  [01105–06, 02634–36]  She noted that Dening suffered from depression and anxiety, as well as feelings of frustration and exhaustion.  [02635]  She further stated that Dening did not seem emotionally or physically healthy enough to return to work. [*Id.*]  However, despite the alleged seriousness of Dening's symptoms, her treatment did not escalate beyond therapy sessions every two weeks.  [*Id.*]  Villalba again concluded that the evidence failed to support psychological impairment after evaluating this information. [00301–05]  She noted that Dening has been able to complete home improvement projects and

engage in socialization and romantic relationships, "not behaviors that support severe emotional impairment." [00304]

Villalba's conclusions were later seconded by psychiatrist Antoinette D. Acenas, M.D., in a June 2020 report. [00359, 02724–33] Dr. Acenas concluded that Dening "has no mental impairment", noting that Dening records show "consistently normal" mental status examinations apart from anxious and depressed mood. [02731] She engaged in the activities of daily living and managed her own healthcare and appointments. [02732] Her treatment consisted of medication management and individual therapy, "which is of low intensity." [*Id.*] Based on this conclusion, Dr. Acenas found that Dening's mental issues "would not prevent work activity at all levels." [*Id.*] Upon receipt of this report, Ms. Waldner disagreed with its conclusions but did not submit any new information. [01126–30]

To clarify and evaluate Dening's physical limitations, Aetna sent requests for functional assessments to her providers in March 2020, including Dr. Koura, Dr. Arnold, and APRN Morris. [00003, 00313, 03643–55] In response, Dr. Koura and Dr. Arnold both agreed that, based on an 8-hour workday, Dening had the functional capacity to sit 1-3 hours at a time with the ability to stretch or change positions, stand and walk 1-2 hours total, engage in frequent to constant reaching, fingering, and handling, and occasionally lift up to 10 pounds. [02844, 02848]

With this information in hand, Aetna consulted with Nizar Suleman, M.D. Dr. Suleman evaluated the medical evidence and prepared two reports in April 2020. [02793–808] He concluded that Dening had the capacity for part-time work up to 20 hours per week. [02807] Dr. Suleman specified that the plaintiff had the functional ability to sit up to 4 hours per day,

stand for 1 hour at a time for up to 2 hours per four-hour workday, walk for 30 minutes at a time for up to 2 hours per four-hour workday, and lift up to 10 pounds occasionally. [*Id.*]

After receiving these reports, Aetna followed up with vocational expert Stephanie Farland, M.Ed., CRC, to evaluate whether occupations existed within the restrictions provided by Dr. Suleman that met the 80% wage requirement of the Plan. [00322–25] Farland produced an Employability Analysis Report on May 8, 2020. [00330–33, 02765–71] Because Dening has a Bachelor of Arts in Elementary Education, two years of radiology training, and a host customer service and retail experience, the report found that she was well suited to a variety of sedentary occupations. [00336–37, 02765–67, 03047–48, 03053] Farland identified 19 occupations that were within Dening's functional capacity, satisfied Dr. Suleman's part time restriction, and met the Plan's wage requirement on that part-time basis. [02766–67] She further concluded that Dening has "direct[ly] transferable skills for these occupations based on her past work experience," and the occupations "use worker traits and habits that Ms. Dening [already] possesses," which will allow her to perform the essential functions with minimal learning. [02767]

While this information-gathering process was occurring, Dening's claim for Social Security disability benefits ("SSDI") was winding its way through the Social Security Administration ("SSA"). On December 7, 2017, Dening's claim was denied at the reconsideration level. [03017] The SSA found that, although Dening was "somewhat limited by [her] asthma and nodules on [her] lungs, [her] spells do not occur with the severity or frequency required to meet our definition of disability." [03017] It also found that her mental impairments "prevent [her] from working in a public setting," but that she was "still able to

perform work which does not require a great deal of contact with other people." [*Id.*] Dening's claim was denied again at the Administrative Law Judge Level on September 19, 2019, and again at the appeal level in July 2020.  [00259, 00370]

Based on the information provided by Dr. Suleman and Farland's vocational report, Aetna determined that Dening did not meet the Plan's any occupation test of disability and closed her claim on July 3, 2020.  [00002, 00364, 03685–89]  Its notice provided the reasoning for the closure and advised her of her right to an administrative review.  [03686–88]  Dening administratively appealed the termination on December 22, 2020.  [02213–25]  She contended that she lacked the physical and mental capacity to perform any work.  Along with her appeal, Dening submitted largely duplicative medical records, but did not produce any vocational evidence.  [02213–14]

Aetna consulted additional experts in response to Dening's appeal.  First, it turned to Jonathan Gelfand, M.D., FCCP to assess her physical limitations.  Dr. Gelfand produced a written report on January 29, 2021, after analyzing the evidence.  [00893–902]  He found that Dening did indeed have "ongoing impairment of lung function" that "limits her overall function."  [00899, 00901]  However, he also found that her condition did not prevent her from working within appropriate limitations and accommodations.  Dr. Gelfand concluded that Dening had the functional capacity for full-time work, 8 hours per day, 40 hours per week, with unlimited sitting and standing, and walking limited to 5 minutes at a time.  [00899–900]  He also advised that Dening should have constant access to her inhaler and avoid exposure to respiratory irritants and others who may have a contagious respiratory illness.  [*Id.*]

To further assess Dening's mental health condition, Aetna consulted clinical neuropsychologist, Courtney C. Spilker, Psy.D., ABPP-CN, who prepared a report the same day as Dr. Gelfand. [00906–13] While Dr. Spilker noted that the record documents symptoms of anxiety, she found that Dening's treatment of biweekly therapy and psychiatric medication management, "is inconsistent with an individual experiencing severe mental health symptoms contributing to impairment." [00911] Spilker ultimately found that Dening's symptoms were not severe enough to preclude her from working and "there is no indication for impairment due to a psychological, behavioral, and/or cognitive impairment as of 7/3/20." [00911–12]

Aetna also consulted an additional vocational expert, Jocelyn Hutton, MS, CRC, CEAS. Hutton prepared an Employability Analysis Report on February 11, 2021, identifying over a dozen occupations that Dening has the vocational experience to perform, that are within the functional capacity described by Dr. Gelfand, and that meet the Plan's 80% wage requirement. [00863–66]

As part of the appeal process, Aetna provided Dening and her treating physicians with these reports, obtained their input, and reviewed the additional information received. [00400, 00464–66, 00481, 00525–26, 00770–75, 03824–25, 04049] Dening's supplemental submissions criticized the opinions of Dr. Gelfand and Dr. Spilker and provided some additional medical records as well as an email from Dr. Koura and a letter from Ms. Waldner. [00791, 00886–88] The medical records included reports from several office visits with Dr. Koura and APRN Morris. At these visits, both Dr. Koura and APRN Morris noted that Dening's lungs were clear and evidenced no wheezing, crackles, rales or rhonchi. [00527,

00776, 00779, 00783]  Her breathing was "even and unlabored," and her oxygen saturation ranged between 98% and 99%.  [00776, 00779, 00783]

Dr. Koura's email, dated March 4, 2021, states that Dening "will not be able to hold [a] full-time position in my opinion based on her subjective dyspnea, diagnosis of sarcoidosis and evidence of significant obstruction on her last spirometry with an FEV1 of 58%."[4]  [00791] However, the email did not retract or otherwise modify his previous functional assessments, nor did it contest the fact that the referenced spirometry reading was considered by Dr. Gelfand and Dr. Suleman in formulating their opinions.  [*Id.*; *see also* 00897, 02250, 02640–41, 02796, 02844.]

Meanwhile, Ms. Waldner's letter simply reiterated her opinion that Dening was unable to work.  [00887–88]  She did not discuss Dr. Spilker's analysis or dispute any of the bases for her conclusions that Dening's symptoms and treatment regimen were not indicative of impairment precluding full-time work.  [*See id.*]  Waldner did, however, provide a June 2000 Psychological/Educational Evaluation of Dening by Johnnie E. Terrell, Ph. D.  [00564–71]  It listed Dening's diagnoses as major depressive disorder, dysthymic disorder, generalized anxiety disorder, attention deficit hyperactivity disorder, and reading disorder.  [00571]

Aetna submitted this additional information to Dr. Gelfand and Dr. Spilker for evaluation and review.  [00419–20, 00422, 00455]  They both concluded, however, that the information did not alter their previous opinions.  [00494, 00503–04, 00760, 00768]  Dr. Gelfand concluded that the information was consistent with prior records and that Dening's

---

[4]     FEV1 is the amount of air you can force from your lungs in one second.  *FEV1 and COPD: How to Interpret Your Results*, HEALTHLINE, https://www.healthline.com/health/fev1-copd (last visited July 11, 2022).

condition does not affect her capacity within the limits previously identified.  [00494–95, 00760–61]  Dr. Spilker similarly concluded that "there remains insufficient information to support impairment from a psychiatric condition."  [00768]  In reaching this conclusion, Dr. Spilker relied on the fact that there had been no consideration of a higher level or intensity of care, and that Dening's symptoms had not significantly changed.  [*Id.*]

On June 11, 2021, Aetna informed Dening that it was upholding the decision to close her claim and that she had exhausted her administrative remedies.  [04097–101]  Dening then filed this action on July 29, 2021, in Clark County Circuit Court, and Aetna removed the case to this Court on August 24, 2021.  [Record No. 1]

## II.

The parties agree that this action is subject to a *de novo* standard of review.  Under this standard, the Court takes a "'fresh look' at the administrative record," considers the proper interpretation of the ERISA plan, and determines whether the employee is entitled to benefits under its terms.  *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 616 (6th Cir. 1998) (citing *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990)); *Perry*, 900 F.2d at 966. The Court relies solely on the administrative record, and the plan administrator's initial decision and its decision-making process are irrelevant.  *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps.*, 741 F.3d 686, 699 (6th Cir. 2014).

Dening bears the burden of proving by a preponderance of the evidence that she satisfies the terms of the Plan and qualifies for LTD benefits.  *Id.* at 700.  This burden remains on the plaintiff even where—as here—benefits have previously been awarded.  *Meiman v. Aetna Life Ins. Co.*, No. 2:18-cv-75, 2019 U.S. Dist. LEXIS 191448, at *12 (E.D. Ky. Nov. 5,

2019) (citing *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 985–86 (6th Cir. 1991)).  And because the plaintiff bears the burden, any gaps in the record cut against her claim.  *Bustetter v. Standard Ins. Co.*, 529 F. Supp. 3d 693, 707 (E.D. Ky. 2021) (citing *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 304 (7th Cir. 2020)).

### III.

Dening contends that her physical and mental health issues render her unable to perform any gainful activity.  [Record No. 21-1, p. 13–17]  In support, she relies on the opinions of her treating physicians, Dr. Koura and Dr. Arnold, as well as that of her therapist, Ms. Waldner.  [Record No. 25, p. 1–12]  Aetna argues in response that the weight the evidence, including Dening's treatment records, the opinions of her providers and those of Aetna's consultants, reports from two vocational specialists, and the Social Security Administration's denial of Dening's disability claim, demonstrates that she failed to meet the Plan's test of disability.  [Record No. 26, p. 5–7]

Dening's ongoing health issues are clear.  These issues limit the types of gainful employment she can pursue.  What is not clear, however, is that they prevent her from working entirely.  Instead, the totality of the evidence establishes that Dening can perform at least some gainful activity.  [*See generally* 00001–04197.]  As a result, she does not meet the Plan's test of disability, and Aetna's decision will be affirmed.

### A.    Dening's Physical Condition

Dening relies mainly on her list of diagnoses as well as select opinions and test results from her medical providers to establish her physical disability.  [*See* Record No. 21-1, p. 13–17.]  Aetna responds that diagnoses alone are not enough and that the totality of the evidence,

including functional assessments from Dening's treating providers, illustrates that she does not meet the test of disability.  [*See* Record No. 26, p. 5–14.]  Upon review, the evidence demonstrates that Dening has the functional capacity to perform some gainful activity even with her health conditions.

First, while Dening does have some serious diagnoses, the fact of diagnosis is not enough to establish that she cannot perform any gainful activity.[5]  The critical question is not whether Dening does or does not have a diagnosed condition, but whether she is "disabled" as that term is defined in the Plan.  *See Hayden v. Martin Marietta Materials, Inc. Flexible Benefits Program*, 763 F.3d 598, 605 (6th Cir. 2014) ("Although [the plaintiff] was diagnosed with a degenerative disease, she was still required to demonstrate that on January 4, 2010, the arthritis prevented her from performing the duties of her occupation.").  Here, the Plan defines disability in reference to a functionality-based test of Dening's capacity to perform any gainful activity.  [04115, 04121] As a result, the specific functional assessments completed by both Dening's providers and the consultants hired by Aetna are of the greatest evidentiary value.

And across the board, those assessment establish that Dening has the capacity to engage in some gainful activity.  [*See* 00494–95, 00760, 00899–900, 02640–41, 02793–808, 02844, 02848, 02853.]  Dening's own providers submitted multiple assessments detailing restrictions that would still allow her to obtain gainful employment.  Her primary care physician (Dr. Arnold) concluded that, based on an eight-hour workday, Dening had the capacity to sit 1-3

---

[5]      According to Dening, her list of physical diagnoses includes "sarcoidosis . . . in addition to severe persistent asthma, chronic fatigue, chest pain, dyspnea on exertion, mediastinal adenopathy, and obstructive sleep apnea."  [Record No. 21-1, p. 2]  She has also been diagnosed with type II diabetes.  [00783]

hours at a time, stand and walk 1-2 hours total, engage in frequent to constant reaching, fingering, and handling, and occasionally lift up to 10 pounds.  [02848]  He specified on a separate form that engaging in "too much" (i.e., greater than occasional) bending at the waist, kneeling, crouching, climbing, or balancing would result in shortness of breath.  [02853]  Dening's pulmonologist (Dr. Koura) concurred with the assessment that she can sit 1-3 hours at a time, stand and walk 1-2 hours total, engage in frequent to constant reaching, fingering, and handling, and occasionally lift up to 10 pounds.[6]  [02844]  In addition, he restricted her from "exposure to dust/fumes."  [02641]

These restrictions are consistent with those submitted by Aetna's consultants.[7]  Taking into account Dening's reduced lung function, Dr. Nizar Suleman, M.D., concluded that she had the capacity to sit up to 4 hours per day, stand for 1 hour at a time for up to 2 hours per four-hour workday, walk 30 minutes at a time for up to 2 hours per four-hour workday, and

---

[6]   While Dening places major reliance on Dr. Koura's March 4, 2021, email that she "will not be able to hold a full-time position," that reliance is misplaced.  [00791]  The Plan's test of disability is not whether she is able to hold full time employment.  Rather, it is whether she is unable because of her illness to perform the material duties of any gainful activity for which she is reasonably fitted and from which she could earn at least 80% of her prior income.  [04121, 04115]  An opinion that she cannot hold *full time* work does nothing to answer that question.

[7]   Dening takes issue with Aetna's use of these "file reviews," which she claims are unreliable and "insufficient . . . [to] terminat[e] benefits in this situation."  [Record No. 23, p. 13]  But there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).  This is true even where the file review disagrees with the conclusions of a treating physician.  *Id.* at 296 n.6.  And while there is no basis to elevate the opinions of the file reviewers *over* those of the treating physicians, neither is there any basis to disregard the file reviews entirely.  *See Bruton v. Am. United Life Ins. Corp.*, 798 F. App'x 894, 904 (6th Cir. 2020).  The Court considers the totality of the evidence, of which these file reviews are only one piece.

lift up to 10 pounds occasionally.  [02807]  Similarly, Dr. Jonathan Gelfand, M.D., concluded that Dening's lung impairment limited her overall function, but that she was still able to work full time with unlimited sitting, standing, grasping, and manipulating, walking limited to 5 minutes at a time up to twice each hour, and lifting up to 25 pounds occasionally.  [00494–95, 00760, 00899–900]  He also noted that she should have constant access to her inhalers and avoid exposure to respiratory irritants and those who may have a contagious respiratory illness. [*Id.*]

Dening clearly retains the capacity to engage in at least some gainful activity based on these functional assessments.  This conclusion is reinforced by the findings of both the vocational specialists hired by Aetna as well as those of the Social Security Administration. Using the functional assessments provided by Drs. Gelfand and Suleman, two vocational experts prepared reports analyzing Dening's employability.  [00863–66, 02765–71]  These experts each identified over a dozen occupations that Dening had the vocational qualifications to perform, that were within the functional restrictions specified by Drs. Gelfand and Suleman (including Dr. Suleman's restriction to part time work), and that satisfied the Plan's 80% earning's requirement.[8]  [00866, 02767]  They further found that Dening has "direct[ly] transferable skills for these occupations based on her past work experience," and that these occupations exist in reasonable numbers in the national economy.  [*Id.*]

---

[8]     The gainful activity must result in an income of more than 80% of her adjusted pre-disability earnings to disqualify Dening from benefits under the Plan.  [04115]  Because her annual earnings at Amazon were $19,253.76, to meet this requirement the occupations must provide annual wages of at least $16,441.84.  [00322]

Dening, meanwhile, did not provide any vocational evidence to counter these conclusions or otherwise demonstrate that she is not able to perform these occupations. In fact, she has previously conceded that she "might" be able to work at a "sit down job," such as those identified by Aetna's vocational experts. [00283] And while she complains that her treating providers' opinions were not considered in developing the reports, this is neither accurate nor is it reason to disregard the reports. [*See* Record No. 21-1, p. 14.] The opinions of Dening's treating providers were factored into the assessments completed by Drs. Gelfand and Suleman. [*See* 00491–95, 00757–61, 00893–902, 02793–808.] So, while the vocational experts did not consider the treating providers' opinions *per se*, neither were those opinions wholly disregarded. And further, vocational experts need not adopt the most restrictive version of a claimant's functional ability in their reports. *See Fenwick v. Hartford Life & Acc. Ins. Co.*, 841 F. App'x 847, 854–55, 857–59 (6th Cir. 2021). Their evaluations are appropriate so long as they are based on a functional assessment that is supported by medical evidence, even where the medical evidence is not unanimous. *See id; Young v. Hartford Life & Acc. Ins. Co.*, No. 6:19-61, 2020 U.S. Dist. LEXIS 35385, at *6 (E.D. Ky. Mar. 2, 2020) ("[V]ocational expert[s] [are] not qualified to sort through various medical opinions and develop [their] own determination of a plaintiff's disabilities.").

The SSA's denial of Dening's disability claim also supports the conclusion that she is not disabled under the Plan. [*See* 03017.] Despite Dening's claim that "the [SSA's] denial is not relevant," it is well-established that the denial of a claim for SSDI is a factor for the Court to consider. *Ezerski v. Kirlins, Inc.*, No. 3:17-cv-69, 2018 U.S. Dist. LEXIS 113642, at *46 (S.D. Ohio July 9, 2018) (noting that the SSA's denial of benefits "may be considered in

evaluating a disability claim" under ERISA *de novo* judicial review); *Klancar*, 2021 U.S. Dist. LEXIS 237254, at *37. And here, the SSA found that while Dening was "somewhat limited by [her] asthma and nodules on [her] lungs, [her] spells d[id] not occur with the severity or frequency required" to render her disabled. [03017] Such a denial obviously weighs against Dening's claim of total disability. *See Connelly v. Standard Ins. Co.*, 663 F. App'x 414, 417 (6th Cir. 2016) (SSA's denial of benefits "weighs in favor of the . . . [insurer's] denial.").

The preponderance of the evidence indicates that Dening's physical conditions are not disabling under the Plan, and thus Aetna's decision terminating benefits was correct. *See Javery*, 741 F.3d at 700 ("Plaintiff must prove by a preponderance of the evidence that [she] was 'disabled' as that term is defined in the Plan."). Disputing this conclusion, Dening argues that Aetna did not provide any evidence of improvement in her condition. [Record No. 23, p. 23] She also points to select test scores illustrating her breathing issues. [*Id.*, p. 6; Record No. 25, p. 7]

Dening's first argument incorrectly states the burden of proof in this matter. Even after benefits have been awarded, the "burden remains exclusively on [the] claimant." *Meiman*, 2019 U.S. Dist. LEXIS 191448, at *12 (citing *Miller*, 925 F.2d at 985–86). Aetna does not bear the burden to *disprove* her claim or to introduce any specific type of evidence. Further, termination of benefits may be "based on any number of factors," including "better evidence showing the extent of the [claimant's] condition." *Davis v. Hartford Life & Acc. Ins. Co.*, 980 F.3d 541, 548–49 (6th Cir. 2020) (internal quotation marks omitted) (quoting *McCollum v. Life Ins. Co. of N. Am.*, 495 F. App'x 694, 704 (6th Cir. 2012)); *Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 414 (6th Cir. 2022) (citing *Morris*

*v. Am. Elec. Power Long-Term Disability Plan*, 399 F. App'x 978, 984 (6th Cir. 2010)). Evidence of improved condition is simply not required for benefits to end. *Smith v. Hartford Life & Acc. Ins. Co.*, No. 5:19-061, 2020 U.S. Dist. LEXIS 133849, at *20–21 (E.D. Ky. July 29, 2020).

Dening's focus on certain breathing test scores serves her no better. She repeatedly emphasizes her October 8, 2019, spirometry test showing an FEV1/FVC ratio of 58%, as well as her "decreased breathing sounds" at one examination.[9] [Record No. 23, p. 6, 9, 15–16] However, other spirometry readings—including one from a month prior to the test emphasized by Dening—show normal findings and ratios as high as 99%. [02467, 02473, 02481] Moreover, this reading does little more than underscore the already-undisputed fact that Dening suffers from diminished lung functioning. It does not by itself prove that she is incapable of gainful activity. Both her providers and Aetna's consultants took account of this test (and numerous others) in formulating functional assessments that would accommodate her breathing difficulties. Still, those assessments do not preclude her from engaging in gainful activity. Dening has failed to establish that her physical conditions cause her to meet the Plan's test of disability.

### B. Dening's Mental Condition

---

[9]    As discussed above, FEV1 is the amount of air you can force from your lungs in one second. *FEV1 and COPD: How to Interpret Your Results*, HEALTHLINE, https://www.healthline.com/health/fev1-copd (last visited July 11, 2022). FVC is the amount of air that can be forcibly exhaled from the lungs after maximal inhalation. *What is Forced Vital Capacity (FVC)?*, VERYWELL HEALTH, https://www.verywellhealth.com/forced-expiratory-capacity-measurement-914900 (last visited July 11, 2022). The FEV1/FVC ratio is the amount of air that can be forcibly exhaled in the first second after a maximal inhalation. *FEV1/FVC Ratio in Spirometry*, VERYWELL HEALTH, https://www.verywellhealth.com/fev1fvc-ratio-of-fev1-to-fvc-spirometry-914783 (last visited July 11, 2022).

Dening also asserts that her cognitive conditions preclude her from engaging in any gainful activity. [Record No. 25, p. 12] She relies entirely on the opinions of her therapist, Barbara Waldner, to support this claim. [*Id.*] However, her mental status is neither disabling nor does it qualify her for benefits under the terms of the Plan.

As an initial matter, the Plan does not allow benefits for a disability due to mental health conditions. It states that "[y]ou will no longer be considered as disabled and eligible for [LTD] benefits after monthly benefits have been payable for 24 months if it is determined that your disability is primarily caused by . . . [a] mental health or psychiatric condition, including physical manifestations of these conditions." [04167] Here, Dening received more than 24 months of benefits. [03552, 03685] And because the Court has concluded that her physical conditions do not meet the Plan's test of disability, her claim now rests primarily on her "mental health or psychiatric condition[s]." [04167] As a result, no matter how severe Dening's mental health conditions may be, they cannot make her eligible for benefits under the terms of the Plan.

Moreover, even if Dening's mental health conditions could make her eligible to receive benefits, they are not sufficiently serious to do so. Although her therapist declared that she is "truly disabled," this opinion runs counter to the weight of the evidence. [00794] Dening has had the same mental health diagnoses for her entire adult life, having been diagnosed in June 2000 with major depressive disorder, generalized anxiety disorder, dysthymic disorder, reading disorder, and attention deficit hyperactivity disorder ("ADHD"). [00571] However, these conditions did not prevent her from obtaining her college degree, receiving training in radiology, or engaging in gainful employment over the past 20 years. [03047–48, 03053–55]

And despite Ms. Waldner's claims that Dening's symptoms preclude social/occupational functioning and impede activities of daily living, she has managed her own healthcare and medications, attended various appointments, performed home improvements, and engaged in romantic relationships.  [00536, 00578, 00794, 02635, 02887]

Further, her consistently normal mental status exams and conservative treatment regimen undermine her claim of a work-precluding impairment.  Dening's initial behavioral health evaluation noted that she had symptoms causing "modest[] functional impairment" and was referred for counseling and medication management.  [02289]  But during subsequent visits she was appropriately groomed and dressed, displayed an organized and logical thought process with no abnormal content, and was alert, oriented, and cooperative with good eye contact and normal speech.  [02293–94, 02297, 02300, 02302–03, 02309]  These findings comport with records from her primary care physician's office noting that she had "normal affect and mood" and that she was alert and oriented and in no acute distress.  [02503–05, 02508, 02510, 02512, 02518]

Dening's treatment plan during this time consisted solely of medication management and twice-monthly therapy sessions.  [02732]  There was never any escalation in the frequency of sessions, nor did Ms. Waldner ever recommend more intensive treatment, such as a rigorous outpatient program or psychiatric hospitalization.  Dening's medications also remained the same with only minor adjustments.  [02731]  This sort of conservative treatment is inconsistent with someone allegedly experiencing complete functional impairment.

Moreover, three separate mental health consultants as well as the Social Security Administration all concluded that Dening did not have work-precluding mental limitations.[10] Board-certified psychiatrist Antoinette D. Acenas, M.D., concluded that she had "no mental impairment" after reviewing Dening's medical record.   [02731]  Similarly, both psychologist Maria Villalba and clinical neuropsychologist Courtney C. Spilker, Psy.D., ABPP-CN, found that Dening's mental health issues are not severe enough to preclude her from all gainful employment.  [00298, 00911–12]  Dr. Spilker explained that there were no "observations of significantly abnormal behaviors or  presentations/symptoms" and that having mental health diagnoses does not in and of itself support functional impairment.  [00504]  And finally, while the Social Security Administration found that Dening's mental impairments "prevent [her] from working in a public setting," she could still perform work that did not require "a great deal of contact with other people."  [03017]

The only medical opinion supporting Dening's claim of disability is that of her therapist, Barbara Waldner.  But, contrary to Dening's assertion, Ms. Waldner's opinion is not entitled to any more weight simply because she was one of Dening's treating providers.  *See Bruton*, 798 F. App'x at 904 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 830 (2003)).  In fact, because her opinion runs counter to the totality of the medical evidence, it is entitled to *less* weight.  *See Judge v. Metro Life Ins. Co.*, 710 F.3d 651, 661 (6th Cir. 2013)

---

[10]     Dening once again objects to Aetna's use of these "file reviews."  [*See, e.g.*, Record No. 25, p. 4–5.]  However, as discussed above, there is "nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination."  *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 296 (6th Cir. 2005).  This is true even where the file review disagrees with the conclusions of a treating physician.  *Id.* at 296 n.6.  The Court considers these file reviews as just one part of the larger evidentiary picture.

(less weight given to medical opinion that is inconsistent with the other findings). Ultimately, this sole opinion is not sufficient to carry Dening's burden. *See Javery*, 741 F.3d at 700.

Neither Dening's physical nor mental health issues preclude her from performing any gainful activity. Thus, she is not entitled to LTD benefits under the Plan.

**IV.**

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1. Plaintiff Pamela Dening's motion for judgment [Record No. 21] is **DENIED**.

2. Defendant Aetna Life Insurance Company's motion for judgment [Record No. 22] is **GRANTED**.

Dated: July 12, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky
